Exhibit A

FILED
5th JUDICIAL DISTRICT COURT
Eddy County
10/23/2025 3:58 PM
MARTHA HUEREQUE
CLERK OF THE COURT
Lasey Garcia

**STATE OF NEW MEXICO**
**FIFTH JUDICIAL DISTRICT**
**EDDY COUNTY**

ISABELL FLORES; a minor, by and through her mother and guardian, LACEY FLORES and LACEY FLORES, individually,

    **Plaintiff**,

v.

PACELAND INC. dba PACEARTH, a California corporation; AMAZON.COM, INC., a Delaware corporation; JOHN DOES I-V; JANE DOES I-V; BLACK CORPORATIONS I-X; WHITE PARTNERSHIPS I-X

    **Defendants**.

**No.**   D-503-CV-2025-01019

Case assigned to Lewis, AnneMarie C.

## CIVIL COMPLAINT

Isabell Flores, a minor, by and through her mother and guardian, Lacey Flores, and Lacey Flores, an individual, through their undersigned counsel KELLY LAW TEAM, hereby submits the following as her Complaint against Defendants for injuries sustained by Plaintiff.

### PARTIES, JURISDTICTION, AND VENUE

1. Plaintiff ISABELL FLORES ("Isabell" or "Plaintiff") is a minor child born November 4, 2008, who resides in Eddy County, New Mexico, at all times alleged in this Complaint.

**Exhibit A**

2.      Plaintiff LACEY FLORES ("Ms. Flores") is an individual who resides in Eddy County, New Mexico, at 1108 W Stevens Street, Carlsbad, New Mexico 88220, at all times alleged in this Complaint.

3.      Ms. Flores is Isabell's mother and natural guardian and brings this action on behalf of her minor daughter Isabell and in her individual capacity.

4.      Defendant PACELAND INC. dba PACEARTH ("Pacearth") is a California corporation, with Entity Number 4715666, with its principal place of business at 1364 South Marion Court, City of Industry, California 91745.

5.      Upon information and belief, Pacearth conducted business in New Mexico during all times alleged in this Complaint by selling products to New Mexico residents through interstate commerce.

6.      Upon information and belief, Pacearth's registered agent for service of process is Tang Mei Chun, located at 1364 South Marion Court, City of Industry, California 91765.

7.      Defendant AMAZON.COM, INC. ("Amazon") is a Delaware corporation with its principal place of business in Seattle, Washington.

8.      Upon information and belief, Amazon conducted business in New Mexico during all times alleged in this Complaint by operating as an online marketplace and fulfillment service provider with substantial operations in New Mexico.

9.      Defendant Amazon operates a nationwide online retail marketplace through which it sells and distributes consumer goods directly to the public under the "Amazon" brand.

10.     Upon information and belief, Amazon had, and still has, exclusive control over the fulfilled by Amazon distribution system through which the subject product was sold and delivered to Plaintiff in New Mexico.

11.     Defendants JOHN DOES I-V and JANE DOES I-V ("Fictitious Individuals") are fictitious individuals and BLACK CORPORATIONS I-X and WHITE

**Exhibit A**

PARTNERSHIPS I-X ("Corporate Defendants") are corporations, businesses, entities, agents, servants, or employees whose true names are currently unknown to Plaintiff.

12. The Fictitious Individuals and Corporate Defendants were either spouses, servants, employees, employers, owners, parent companies or subsidiaries of the named defendants.

13. Upon information and belief, the Fictitious Individuals and Corporate Defendants are, in some manner, responsible for the acts alleged in this Complaint.

14. The Fictitious Individuals and Corporate Defendants are believed to reside or conduct business in New Mexico.

15. Plaintiff will seek to amend this Complaint when and if she discovers the true names of the Fictitious Individuals and/or the Corporate Defendants.

16. Upon information and belief, each Defendant including Pacearth, Amazon, the Fictitious Individuals, and the Corporate Defendants (collectively, "Defendants") were agents, servants, employees, successors in interest, and/or joint venturers of their co-defendants and were acting within the course, scope, and authority of said agency, employment, and/or venture.

17. Each Defendant, when acting as principal, was negligent in the selection and hiring of each other Defendant as an agent, servant, employee, successor in interest, and/or joint venture.

18. Each Defendant was the employee and/or agent of each of the other Defendants, and all acts by any of the Defendants were in the course and scope of their employment and/or agency with all the other Defendants, and each was acting on their own behalf, as well as on behalf of all Defendants.

19. No other action is pending in relation to the events alleged in this Complaint.

20. This Court has jurisdiction over this matter pursuant to NM Stat § 38-1-16 (2024) as all defendants conduct or transact business in New Mexico and committed a

**Exhibit A**

tortious act within the State of New Mexico.

21.     Eddy County is the proper venue for this action pursuant to NM Stat § 38-3-1 (2024) as the incident occurred in Eddy County, New Mexico, and Plaintiff resides in Eddy County, New Mexico.

## GENERAL ALLEGATIONS

21.     On February 26, 2023, Ms. Flores purchased a PACEARTH 2 Pack Swings Seats product from Amazon.com for her family's use at their residence.

22.     The product was specifically marketed and sold as "PACEARTH 2 Pack Swings Seats Holds 660lbs with 68.9 inch Anti-Rust Chains Plastic Coated 23.6 inch Tree Hanging Straps and Locking Buckles Playground Swing Set Accessories Replacement (Blue)" with ASIN B08BHLPSGP.

23.     The purchase price was $43.19, and the product was sold and fulfilled through Amazon's platform under Amazon Order Number 113-7728535-0135400.

24.     The product was delivered to the Flores family residence at 1108 West Stevens Street, Carlsbad, New Mexico 88220, on or around March 2, 2023.

25.     The PACEARTH swing seats were prominently advertised and warranted to hold up to 660 pounds, making them suitable for children and adults alike.

26.     The swing set was installed according to the manufacturer's instructions.

27.     The swing was intended for recreational use by Isabell and other family members at their private residence.

28.     Isabell, who weighed significantly less than the advertised 660-pound capacity, used the swing regularly without incident for approximately six weeks following installation.

29.     On April 15, 2023, at approximately 2:30 p.m., Isabell was using the swing in a normal manner at her family's residence.

30.     Isabell was engaged in typical swinging activity, moving back and forth as swings are designed and intended to be used.

31. During the upswing portion of her normal swinging motion, the swing seat suddenly and without warning broke apart and detached from the chain.

32. The catastrophic failure of the swing seat caused Isabell to fall unexpectedly to the ground below.

33. Isabell landed on her right ankle with significant force, causing her ankle to twist abnormally during the impact.

34. The swing seat failure was complete and total, rendering the product entirely unusable and unsafe.

35. Ms. Flores immediately heard the sound of Isabell's fall and rushed to her daughter's aid.

36. Upon reaching Isabell, Ms. Flores observed that her daughter was in severe distress and initially could not speak due to the shock and pain of the fall.

37. Isabell was unable to bear any weight on her right foot and was experiencing severe pain in her right ankle.

38. Ms. Flores recognized the severity of Isabell's condition and immediately transported her to the Carlsbad Medical Center Emergency Department for medical treatment.

39. At the time of the incident, Isabell was a healthy young girl with no prior history of ankle injuries or related medical conditions.

40. The swing seat had been used exclusively by Isabell, and she had never exceeded the normal use parameters for which the product was designed and marketed.

41. The failure occurred after only approximately six weeks of normal residential use by a single child, well within the expected lifespan of such a product.

42. The swing seat failure was not caused by any misuse, abuse, or abnormal wear and tear, but rather resulted from defects in the design, manufacturing, or materials of the product.

**Exhibit A**

43.    Ms. Flores subsequently discovered through her research that numerous other customers had experienced similar catastrophic failures of PACEARTH swing products.

44.    Multiple Amazon customer reviews documented pattern failures including strap breakages, connector failures, eyelet tears, and safety incidents involving children falling and sustaining injuries.

45.    These customer reviews revealed that similar failures had occurred within weeks to months of purchase, indicating a systemic defect in the PACEARTH swing products.

46.    Ms. Flores contacted PACEARTH regarding the incident and Isabell's injuries.

47.    In response to Ms. Flores' communication, PACEARTH acknowledged the incident and expressed sympathy for Isabell's "bone injury" and the pain she experienced.

48.    However, PACEARTH claimed that this was allegedly the "first and only time we have seen such an incident" despite the documented pattern of similar failures reported by other customers.

49.    PACEARTH further claimed that their swing model "has passed all our safety experiments and tests" and that they had "never received any similar damage reports before," statements that were contradicted by the numerous customer complaints and reviews documenting similar failures.

51.    Upon arrival at the Carlsbad Medical Center Emergency Department on April 15, 2023, Isabell was evaluated by Dr. Patrick K. Booth, MD, who immediately recognized the severity of her injury.

52.    Medical imaging including X-rays and CT scans revealed that Isabell had sustained a displaced trimalleolar fracture of her right ankle, involving acute traumatic fractures of the distal fibula, medial malleolus, and posterior malleolus.

**Exhibit A**

53.     This type of fracture, involving breaks in three separate areas of the ankle, is considered one of the most severe ankle injuries and typically requires surgical intervention.

54.     Isabell's initial pain was rated at 7 out of 10, and she was unable to bear any weight on her right foot due to the severity of the fracture.

55.     The emergency department physicians performed a closed reduction of the fracture under procedural sedation and applied a posterior splint to stabilize the ankle.

56.     Due to the unstable nature and severity of the fracture, Isabell was referred to Dr. Joshua D. Adams, DPM, of Southeast New Mexico Podiatry for surgical consultation and treatment.

57.     On April 20, 2023, Isabell underwent Open Reduction Internal Fixation (ORIF) surgery, a major surgical procedure lasting over three hours.

58.     The surgery required the insertion of extensive hardware including a Synthes 2.7 variable angle distal fibular anatomic plate with locking and nonlocking screws, and 4.0 mm partially-threaded cannulated cancellous screws for the medial malleolus.

59.     Following the surgery, Isabell was required to remain completely non-weight bearing on her right foot for an extended period, necessitating the use of crutches, a pneumatic boot, and other mobility aids.

60.     Isabell's recovery was complicated by the development of neuralgia and neuritis, resulting in persistent numbness extending from the anterior ankle to the dorsal medial foot, approximately one inch wide.

61.     This numbness represents likely permanent nerve damage and sensory loss that continues to affect Isabell's daily activities and quality of life.

62.     Isabell required extensive physical therapy at the Carlsbad Physical Therapy & Wellness Center from August 30, 2023, through November 28, 2023.

**Exhibit A**

63. Throughout her recovery, Isabell experienced ongoing pain, stiffness, and functional limitations that significantly impacted her ability to participate in normal teenage activities including school physical education and recreational activities.

64. Amazon, as the platform through which the defective product was sold and as the entity with exclusive control over the fulfilled by Amazon distribution shipping system, facilitated the sale and delivery of the dangerous product to the Flores family.

65. Amazon, as the platform through which the defective product was sold and as the entity with exclusive control over the fulfilled by Amazon distribution shipping system, put the product at issue into the stream of commerce through storage in Amazon-owned fulfillment centers, processed the customer payment, packaged the item in Amazon-branded materials, and shipped it to the plaintiff.

66. Amazon, as the platform through which the defective product was sold and as the entity with exclusive control over the fulfilled by Amazon distribution shipping system, was exclusively in control of the transaction having total and exclusive control over the customer interface, product search, product listing, product payment transaction, product shipping, and any and all product returns.

67. Amazon, as the platform through which the defective product was sold and as the entity with exclusive control over the fulfilled by Amazon distribution shipping system, derived profit directly related to the product sale above and beyond any neutral listing fee.

68. In fact, upon information and belief, Amazon, as the platform through which the defective product was sold and as the entity with exclusive control over the fulfilled by Amazon distribution shipping system, derived substantially more revenue and profit from this sale than defendant Pacearth did.

69. Amazon, as the platform through which the defective product was sold and as the entity with exclusive control over the fulfilled by Amazon distribution shipping system, held itself out as the seller to the consumer with Amazon specific labeling,

**Exhibit A**

packaging, confirmation e-mails, and branding.

70. Amazon, as the platform through which the defective product was sold and as the entity with exclusive control over the fulfilled by Amazon distribution shipping system, has the exclusive and total control/authority to inspect, warn, and remove items from its platform.

71. Amazon, as the platform through which the defective product was sold and as the entity with exclusive control over the fulfilled by Amazon distribution shipping system, exercises substantial control over third party "seller" accounts including storage, fulfillment, shipment, and brand identity ownership. This control includes the authority to suspend, remove, or delist the item, and to issue warnings or recalls to consumers.

72. Amazon, as the platform through which the defective product was sold and as the entity with exclusive control over the fulfilled by Amazon distribution shipping system, had the ability to inspect and control the quality of the products stored in its fulfillment centers and to require safety documentation or proof of compliance from FBA sellers, but failed to exercise reasonable care in doing so.

73. Amazon, as the platform through which the defective product was sold and as the entity with exclusive control over the fulfilled by Amazon distribution shipping system, was the sole and exclusive distributor of the item at issue. It is and was not available through any other distributor, retailer, or channel of commerce.

74. Amazon, as the platform through which the defective product was sold and as the entity with exclusive control over the fulfilled by Amazon distribution shipping system, handled all transactions logistics, communications, and delivery.

75. Amazon, as the platform through which the defective product was sold and as the entity with exclusive control over the fulfilled by Amazon distribution shipping system, had total and exclusive control over the chain of distribution of this product at every stage.

**Exhibit A**

76. Plaintiff at no point dealt with Pacearth or any other third-party seller directly, only Amazon.

77. The Flores family was caused, and is continued to be caused, to expend large sums of money on medical expenses and other economic losses.

78. Isabell continues to face the risk of developing post-traumatic arthritis and may require additional medical treatment and potential hardware removal surgery in the future.

79. The swing seat failure and resulting injuries have caused Isabell significant pain and suffering, emotional distress, loss of enjoyment of life, and disruption to her education and normal teenage development.

## COUNT I: STRICT PRODUCT LIABILITY - DESIGN DEFECT
### (Against All Defendants)

71. Plaintiff realleges and incorporates all prior allegations by this reference further alleging as follows:

72. At all times relevant to this action, Defendants were engaged in the business of designing, manufacturing, marketing, distributing, and/or selling swing seats and playground equipment to consumers throughout the United States, including New Mexico.

73. The PACEARTH swing seat that caused Isabell's injuries was designed, manufactured, marketed, distributed, and/or sold by Defendants in the regular course of their business.

74. PACEARTH holds itself out as "specializ[ing] in manufacturing and selling professional indoor&outdoor [sic] sports gear" and employing "bold designers and talented ergonomic engineers [who] follow their instincts to come up with groundbreaking ideas, and utilize them into our products that are built to last, to protect, and to bring fun."

**Exhibit A**

75.    The swing seat was unreasonably dangerous when it left Defendants' control due to defects in its design that rendered it unsafe for its intended and reasonably foreseeable uses.

75.    The swing seat contained design defects that made it unreasonably dangerous, including but not limited to inadequate materials, insufficient connection points, improper load distribution, and failure to account for dynamic stress loads during normal swinging motion.

76.    The swing seat's design failed to meet the reasonable expectations of ordinary consumers regarding the safety and durability of playground swing equipment.

77.    A reasonable consumer would expect that a swing seat advertised to hold 660 pounds would safely support a young female child during normal swinging activities for more than six weeks of residential use.

78.    The risks inherent in the swing seat's design outweighed any benefits of that design when evaluated using a risk-utility analysis.

79.    Alternative safer designs were available and feasible at the time of manufacture that would have prevented the catastrophic failure experienced by Isabell.

80.    These alternative designs would not have substantially impaired the utility or desirability of the swing seat while significantly reducing or eliminating the risk of sudden structural failure.

81.    The swing seat's design defects included inadequate connection mechanisms between the seat and chains, insufficient material thickness and strength, poor stress distribution design, and lack of redundant safety features.

82.    The design defects rendered the swing seat unreasonably dangerous for its intended use as playground equipment for children and adults.

83.    The swing seat was being used for its intended purpose in a reasonably foreseeable manner when it catastrophically failed on April 15, 2023.

**Exhibit A**

84.    Isabell was using the swing in exactly the manner it was designed, marketed, and intended to be used when the seat suddenly broke apart.

85.    The design defects were a substantial factor in causing the swing seat to fail and Isabell to fall, resulting in her severe injuries.

86.    As a direct and proximate result of the design defects in the swing seat, Isabell sustained severe and permanent injuries including a displaced trimalleolar fracture requiring surgical repair.

87.    Defendants are strictly liable for Isabell's injuries and damages under New Mexico's strict product liability law for design defects.

88.    Isabell is entitled to recover all damages proximately caused by the design defects, including past and future medical expenses, pain and suffering, and loss of enjoyment of life. Lacey Flores has been caused to expend substantial time, money, and concern over her daughter's injuries; including past and future medical expenses paid as the guardian of her minor daughter.

## COUNT II: STRICT PRODUCT LIABILITY - MANUFACTURING DEFECT
### (Against All Defendants)

89.    Plaintiff realleges and incorporates all prior allegations by this reference further alleging as follows:

90.    The swing seat that injured Isabell contained manufacturing defects that caused it to depart from its intended design and rendered it unreasonably dangerous.

91.    The manufacturing defects included improper assembly at the manufacturing site, defective materials, inadequate quality control, substandard construction techniques, and failure to meet design specifications.

92.    These manufacturing defects caused the swing seat to be more dangerous than identical products that were properly manufactured according to design specifications.

93.    The manufacturing defects were present when the swing seat left Defendants' control and were not caused by any subsequent misuse, modification, or wear and tear.

94.    A properly manufactured swing seat built to the same design specifications would not have failed catastrophically after only six weeks of normal residential use by a single child.

95.    The manufacturing defects rendered the swing seat unreasonably dangerous beyond the expectations of an ordinary consumer familiar with the product's characteristics.

96.    Quality control procedures that met industry standards would have detected and prevented the manufacturing defects present in Isabell's swing seat.

97.    Defendants failed to implement adequate quality control measures to prevent defectively manufactured products from reaching consumers.

98.    The swing seat's departure from its intended design due to manufacturing defects made it substantially more dangerous than swing seats properly manufactured to the same design.

99.    The manufacturing defects were a substantial factor in causing the swing seat to fail suddenly and without warning during normal use.

100.    Isabell had no reasonable way to discover the manufacturing defects prior to the catastrophic failure that caused her injuries.

101.    The swing seat appeared normal and functioned properly for approximately six weeks before the hidden manufacturing defects caused the sudden failure.

102.    As a direct and proximate result of the manufacturing defects, Isabell sustained severe injuries requiring emergency surgery and extensive medical treatment.

103.    The manufacturing defects were the proximate cause of Isabell's fall and resulting injuries, including her displaced trimalleolar fracture and permanent nerve damage.

**Exhibit A**

104.    Defendants are strictly liable for Isabell's injuries and damages under New Mexico's strict product liability law for manufacturing defects.

105.    Isabell is entitled to recover all damages proximately caused by the manufacturing defects, including medical expenses, pain and suffering, and future complications. Lacey Flores has been caused to expend substantial time, money, and concern over her daughter's injuries; including past and future medical expenses paid as the guardian of her minor daughter.

## COUNT III: STRICT PRODUCT LIABILITY - FAILURE TO WARN
### (Against All Defendants)

106.    Plaintiff realleges and incorporates all prior allegations by this reference further alleging as follows:

107.    The swing seat contained dangers that were not obvious to ordinary consumers and required adequate warnings to ensure safe use.

108.    Defendants had a duty to provide adequate warnings and instructions regarding the risks associated with the swing seat and methods to minimize those risks.

109.    Defendants failed to provide adequate warnings about the swing seat's propensity for sudden structural failure, the importance of regular inspection for wear and stress, weight distribution limitations, and environmental factors affecting durability.

110.    Defendants failed to warn consumers that the swing seat might fail catastrophically without visible signs of deterioration or damage.

111.    The warnings and instructions provided with the swing seat were inadequate, unclear, and failed to communicate the serious risk of injury from sudden structural failure.

112.    Adequate warnings would have alerted consumers to inspect the swing seat regularly for stress fractures, material fatigue, and connection point integrity.

Exhibit A

113.    Adequate warnings would have informed consumers about the limitations of the product's stated weight capacity under dynamic loading conditions typical of swinging motion.

114.    Had adequate warnings been provided, Ms. Flores would have implemented additional safety measures or refrained from allowing Isabell to use the swing seat.

115.    The absence of adequate warnings rendered the swing seat unreasonably dangerous when used in a reasonably foreseeable manner.

116.    Defendants knew or should have known of the risks associated with the swing seat based on similar failures reported by other customers and documented in online reviews.

117.    Despite knowledge of similar failures, Defendants failed to provide warnings that would have prevented Isabell's injuries.

118.    The failure to provide adequate warnings was a substantial factor in causing Isabell's injuries because proper warnings would have prevented the use that led to the failure.

119.    Isabell's injuries were a foreseeable consequence of Defendants' failure to provide adequate warnings about the product's dangerous propensities.

120.    As a direct and proximate result of the inadequate warnings, Isabell sustained severe injuries that could have been prevented with proper warnings.

121.    Defendants are strictly liable for Isabell's injuries and damages under New Mexico's strict product liability law for failure to warn.

89.    Isabell is entitled to recover all damages proximately caused by the inadequate warnings, including all medical expenses and pain and suffering. Lacey Flores has been caused to expend substantial time, money, and concern over her daughter's injuries; including past and future medical expenses paid as the guardian of her minor daughter.

**Exhibit A**

## COUNT IV: NEGLIGENCE
### (Against All Defendants)

123. Plaintiff realleges and incorporates all prior allegations by this reference further alleging as follows:

124. Defendants owed Isabell and all consumers a duty to exercise reasonable care in the design, manufacture, testing, quality control, marketing, and distribution of the swing seat.

125. Defendants breached their duty of reasonable care by negligently designing a swing seat with inadequate structural integrity for its intended use.

126. Defendants negligently failed to conduct adequate testing to ensure the swing seat could withstand normal use conditions over its expected lifespan.

127. Defendants negligently failed to implement proper quality control procedures to prevent defective products from reaching consumers.

128. Defendants negligently failed to adequately warn consumers about known risks and proper inspection procedures for the swing seat.

129. Defendants negligently ignored or failed to properly investigate reports of similar failures from other customers.

130. Defendants negligently continued to market and sell swing seats despite knowledge of their propensity for catastrophic failure.

131. Defendants negligently misrepresented the swing seat's weight capacity and durability in their marketing materials.

132. Defendants negligently failed to recall or warn consumers about the swing seat's dangerous propensities after becoming aware of similar failures.

133. A reasonably prudent manufacturer in Defendants' position would have designed a safer product, implemented better quality control, provided adequate warnings, and responded appropriately to reports of failures.

134. Defendants' negligent acts and omissions fell below the standard of care expected of reasonable manufacturers of playground equipment.

135. Defendants' negligence was a substantial factor in causing the swing seat to fail and Isabell to sustain severe injuries.

136. Isabell's injuries were a reasonably foreseeable consequence of Defendants' negligent design, manufacture, and marketing of the swing seat.

137. As a direct and proximate result of Defendants' negligence, Isabell sustained severe physical injuries, pain and suffering, and economic damages.

138. Defendants' negligence directly and proximately caused Isabell's displaced trimalleolar fracture, permanent nerve damage, and need for extensive medical treatment.

90. Isabell is entitled to recover all damages proximately caused by Defendants' negligence, including past and future medical expenses, pain and suffering, and loss of enjoyment of life. Lacey Flores has been caused to expend substantial time, money, and concern over her daughter's injuries; including past and future medical expenses paid as the guardian of her minor daughter.

## COUNT V: BREACH OF EXPRESS WARRANTY
### (Against All Defendants)

140. Plaintiff realleges and incorporates all prior allegations by this reference further alleging as follows:

141. Defendants expressly warranted that the swing seat would "Hold 660lbs" as prominently stated in the product's title and marketing materials.

142. This express warranty was part of the basis of the bargain when Ms. Flores purchased the swing seat for her family's use.

143. The express warranty created reasonable expectations that the swing seat would safely support users well below the stated 660-pound capacity.

**Exhibit A**

144. Isabell, weighing significantly less than 660 pounds, was well within the express warranty's promised capacity when the swing seat failed.

145. The swing seat failed to conform to the express warranty because it could not safely support even a fraction of the warranted weight capacity during normal use.

146. The catastrophic failure after only six weeks of use by a single child demonstrates the swing seat's non-conformity with the express warranty.

147. Defendants breached the express warranty by delivering a product that failed to meet the promised specifications and performance standards.

148. Ms. Flores reasonably relied on the express warranty when making her purchase decision and allowing Isabell to use the swing seat.

149. The breach of express warranty was a substantial factor in causing Isabell's injuries because the family relied on the warranted capacity as an assurance of safety.

150. Isabell's injuries were a direct and proximate result of Defendants' breach of the express warranty regarding weight capacity.

91. As a result of the breach of express warranty, Isabell suffered severe injuries, pain and suffering, and economic damages. Lacey Flores has been caused to expend substantial time, money, and concern over her daughter's injuries; including past and future medical expenses paid as the guardian of her minor daughter.

151. Defendants are liable for all damages flowing from their breach of express warranty, including medical expenses and consequential damages.

## COUNT VI: BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (Against All Defendants)

153. Plaintiff realleges and incorporates all prior allegations by this reference further alleging as follows:

154. At the time of sale, Defendants impliedly warranted that the swing seat was merchantable and fit for the ordinary purposes for which such goods are used.

Exhibit A

155.    The swing seat was not merchantable because it was not fit for the ordinary purpose of providing safe recreational swinging for children and adults.

156.    A merchantable swing seat would be capable of safely supporting users during normal swinging activities for a reasonable period of time.

157.    The swing seat's catastrophic failure after only six weeks of normal residential use demonstrates it was not merchantable.

158.    The swing seat did not possess the quality and characteristics that buyers could reasonably expect from playground swing equipment.

159.    A merchantable swing seat would not fail suddenly and without warning during normal use by a user well within the stated weight limits.

160.    The swing seat's failure to meet basic safety and durability expectations rendered it unmerchantable.

161.    Defendants breached the implied warranty of merchantability by selling a swing seat that was unfit for its ordinary purpose.

162.    Ms. Flores had a right to rely on the implied warranty that the swing seat would be suitable for its intended use.

163.    The breach of the implied warranty of merchantability was a substantial factor in causing Isabell's injuries.

164.    As a direct and proximate result of the breach of implied warranty of merchantability, Isabell sustained severe injuries and damages.

165.    Isabell and Lacey are entitled to recover all damages flowing from Defendants' breach of the implied warranty of merchantability.

## COUNT VII: BREACH OF IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE
### (Against All Defendants)

166.    Plaintiff realleges and incorporates all prior allegations by this reference further alleging as follows:

167. At the time of purchase, Defendants had reason to know that Ms. Flores was purchasing the swing seat for the particular purpose of providing safe recreational equipment for her family, including her teenage daughter.

168. Defendants had reason to know that Ms. Flores was relying on Defendants' skill and judgment in selecting a suitable swing seat for family recreational use.

169. Defendants impliedly warranted that the swing seat was fit for the particular purpose of providing safe playground equipment for family use.

170. The swing seat was not fit for the particular purpose for which it was purchased because it failed catastrophically during normal family recreational use.

171. Ms. Flores reasonably relied on Defendants' implied warranty that the swing seat would be suitable for safe family recreation.

172. Defendants breached the implied warranty of fitness for a particular purpose by providing a swing seat that was unsuitable for safe family recreational use.

173. The breach of the implied warranty of fitness for a particular purpose was a substantial factor in causing Isabell's injuries.

174. As a direct and proximate result of the breach of implied warranty of fitness for a particular purpose, Isabell sustained severe injuries and damages.

175. Isabell and Lacey are entitled to recover all damages flowing from Defendants' breach of the implied warranty of fitness for a particular purpose.

## COUNT VIII: FRAUDULENT MISREPRESENTATION/CONCEALMENT
### (Against All Defendants)

176. Plaintiff realleges and incorporates all prior allegations by this reference further alleging as follows:

177. Defendants made material misrepresentations of fact regarding the swing seat's safety, durability, and weight capacity in their marketing materials and product descriptions.

Exhibit A

178. Defendants represented that the swing seat would "Hold 660lbs" when they knew or should have known this representation was false or misleading under normal use conditions.

179. Defendants knew or should have known that their representations regarding the swing seat's safety and durability were false based on reports of similar failures from other customers.

180. Multiple Amazon customer reviews documented similar catastrophic failures of PACEARTH swing products, indicating Defendants had knowledge of the product's dangerous propensities.

181. Despite knowledge of similar failures, Defendants continued to represent the swing seat as safe and capable of supporting the advertised weight capacity.

182. Defendants concealed material facts regarding the swing seat's propensity for sudden structural failure and its inability to safely support users during dynamic loading conditions.

183. Defendants had a duty to disclose the swing seat's dangerous propensities and history of similar failures to potential purchasers.

184. Defendants' misrepresentations and concealment were made with the intent to induce consumers, including Ms. Flores, to purchase the swing seat.

185. Ms. Flores justifiably relied on Defendants' representations regarding the swing seat's safety and weight capacity when making her purchase decision.

186. Had Defendants disclosed the true facts about the swing seat's dangerous propensities and history of failures, Ms. Flores would not have purchased the product.

187. Defendants' fraudulent misrepresentations and concealment were a substantial factor in causing Isabell's injuries by inducing the purchase and use of a dangerous product.

188. As a direct and proximate result of Defendants' fraudulent misrepresentations and concealment, Isabell sustained severe injuries and damages.

**Exhibit A**

189. Defendants' conduct was willful, wanton, and in reckless disregard for the safety of consumers, entitling Isabell to punitive damages.

190. Isabell and Lacey are entitled to recover all damages caused by Defendants' fraudulent misrepresentations and concealment, including punitive damages.

## COUNT IX: NEGLIGENT MISREPRESENTATION
### (Against All Defendants)

191. Plaintiff realleges and incorporates all prior allegations by this reference further alleging as follows:

192. Defendants negligently supplied false information regarding the swing seat's safety, durability, and weight capacity to consumers in the course of their business.

193. Defendants negligently represented that the swing seat would safely support 660 pounds during normal use when they lacked reasonable grounds for making such representations.

194. Defendants negligently failed to investigate and verify the accuracy of their representations regarding the swing seat's performance and safety characteristics.

195. Defendants owed a duty of care to consumers to ensure that their representations regarding product safety and performance were accurate and based on adequate testing.

196. Defendants breached their duty by negligently making representations about the swing seat's capabilities without adequate investigation or testing to support such claims.

197. Defendants knew or should have known that consumers would rely on their representations when making purchase decisions and determining safe usage parameters.

198. Ms. Flores justifiably relied on Defendants' representations regarding the swing seat's weight capacity and safety when purchasing the product for her family's use.

Exhibit A

199.    Defendants' negligent misrepresentations were made in the course of their business of marketing and selling playground equipment to consumers.

200.    The negligent misrepresentations induced Ms. Flores to purchase and allow Isabell to use a product that was more dangerous than represented.

201.    Defendants' negligent misrepresentations were a substantial factor in causing Isabell's injuries by creating false confidence in the product's safety.

202.    As a direct and proximate result of Defendants' negligent misrepresentations, Isabell sustained severe injuries requiring extensive medical treatment.

203.    Isabell and Lacey are entitled to recover all damages proximately caused by Defendants' negligent misrepresentations, including medical expenses and pain and suffering.

## COUNT X: VIOLATIONS OF CONSUMER PROTECTION STATUTES
### (Against All Defendants)

204.    Plaintiff realleges and incorporates all prior allegations by this reference further alleging as follows:

205.    Defendants' conduct violated the New Mexico Unfair Practices Act, [N.M.S.A. § 57-12-1 et seq.], by engaging in unfair or deceptive trade practices in connection with the sale of the swing seat.

206.    Defendants engaged in deceptive trade practices by misrepresenting the swing seat's safety characteristics, weight capacity, and durability to consumers.

207.    Defendants violated consumer protection laws by failing to disclose material facts regarding the swing seat's dangerous propensities and history of similar failures.

208.    Defendants' marketing and sale of a defective product with knowledge of its dangerous characteristics constitutes an unfair trade practice under New Mexico law.

Exhibit A

209.    Defendants' conduct had the capacity to mislead consumers regarding the true safety and performance characteristics of the swing seat.

210.    Ms. Flores suffered actual damages as a result of Defendants' violations of consumer protection statutes, including the cost of the defective product and medical expenses for Isabell's injuries.

211.    Defendants' violations of consumer protection statutes were willful and knowing, entitling Isabell to enhanced damages and attorney's fees under applicable law.

212.    The New Mexico Unfair Practices Act was designed to protect consumers like Ms. Flores from deceptive and unfair business practices in the marketplace.

213.    Isabell and Ms. Flores are within the class of persons the consumer protection statutes were intended to protect.

214.    Defendants' violations of consumer protection statutes were a substantial factor in causing Isabell's injuries by facilitating the sale of a dangerous product.

215.    As a direct and proximate result of Defendants' violations of consumer protection statutes, Isabell sustained damages including medical expenses, pain and suffering, and economic losses.

216.    Isabell and Lacey are entitled to recover all damages allowed under New Mexico's consumer protection statutes, including actual damages, attorney's fees, and enhanced damages where applicable.

## DEMAND FOR TRIAL BY JURY

217.    Plaintiff demands trial by jury of six persons.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as follows:

A.    For general damages for Plaintiff, in a fair, just, and reasonable sum in excess of the minimum jurisdictional limits of this Court;

**Exhibit A**

B.      For past and future medical expenses incurred by Plaintiff in a sum according to proof;

C.      For past and future pain and suffering in a sum according to proof;

D.      For loss of enjoyment of life and loss of earning capacity in a sum according to proof;

E.      For punitive damages in an amount sufficient to punish Defendants and deter similar conduct, according to proof at trial;

F.      For pre-judgment interest allowable by law;

G.      For attorneys' fees as provided by law, according to proof at trial;

H.      For costs of suit herein incurred; and

I.      For such other and further relief as the Court may deem just and proper under the circumstances.


Dated October 22, 2025

                           Respectfully Submitted,

                           KELLY LAW TEAM, PLLC

                           By: */s/ David I. Iversen*
                                  **David I. Iversen (NM Bar No. 164074)**
                                  1 E Washington St, Suite 1520
                                  Phoenix, AZ 85004
                                  (602) 283-4122
                                  david.iversen@kellylawteam.com
                                  courtdocs@kellylawteam.com
                                  Attorney for Plaintiff

Exhibit A

FILED
5th JUDICIAL DISTRICT COURT
Eddy County
10/23/2025 4:57 PM
MARTHA HUEREQUE
CLERK OF THE COURT
Kristi Fitzgerald

STATE OF NEW MEXICO

COUNTY OF EDDY

FIFTH JUDICIAL DISTRICT COURT

No. D-503-CV-2025-01019

Lacey Flores

v.

Paceland Inc., et. al.

## ORDER REGARDING COURTESY COPIES OF PLEADINGS

**In order to ensure timely setting of motions, the parties are hereby notified that ALL pleadings filed by the parties are to be served on the Court either via email directly to chambers at carddiv12proposedtxt@nmcourts.gov or via hand delivered to the Court's chambers on the 2 nd floor of the Eddy County District Courthouse at 102 N. Canal Suite 240, Carlsbad, NM.**

All motions must include a request for hearing indicating the time needed for the setting and if the motion requires an evidentiary hearing, the request for hearing shall comport with NMRA 5-601(f). The request for hearing must also be served on the Court as outlined above.

This Order serves to advise the parties that e-filing of a pleading does not suffice as providing a courtesy copy to the Court as the Court does not always receive notice of e-filed pleadings.

IT IS SO ORDERED.

ANNEMARIE C. LEWIS
District Court Judge Division 12